IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 20, 2021 Session

## KATHERINE D. MORGAN v. KENNETH F. MORGAN, JR.

**Appeal from the Chancery Court for Hamilton County**
**No. 15-0301      W. Jeffrey Hollingsworth, Judge[1]**

_____

### No. E2020-00618-COA-R3-CV

_____

In this divorce case, Kenneth F. Morgan, Jr. ("Father") appeals the trial court's judgment adopting a permanent parenting plan that designates Katherine D. Ward[2] ("Mother") as primary residential parent of the parties' child and grants Father parenting time of every other weekend. Father also argues that the trial court erred in (1) allowing the expert psychologist tasked with a parental assessment to testify in the manner in which he did; (2) declining Father's request to remove the child's guardian ad litem ("GAL") for alleged bias; (3) ordering Father to pay two-thirds of the GAL fees awarded by the court; and (4) awarding Mother attorney's fees and costs. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

John P. Konvalinka, Katherine H. Lentz, and Lawson Konvalinka, Chattanooga, Tennessee, for the appellant, Kenneth F. Morgan, Jr.

John R. Meldorf, III, Hixson, Tennessee, for the appellee, Katherine D. Ward.

### OPINION

### I. BACKGROUND

_____

[1] Sitting by interchange.

[2] At the time of the filing of her complaint, Mother's name was Katherine Morgan, because the parties were then married. She has since remarried, and we refer to her using her current surname of Ward.

The parties married on May 29, 2010. They separated in 2012, a year before their only child was born on August 6, 2013. Mother filed for divorce on May 27, 2015. The parties filed an executed marital dissolution agreement and agreed permanent parenting plan on December 21, 2015. That same day, however, Father made an oral motion alleging dependency and neglect against Mother, and requested a restraining order. He also filed a sworn complaint in Hamilton County Juvenile Court alleging Mother abused and neglected the child. These allegations primarily resulted from an accident on December 16, 2015, while the then two-year-old child was in Mother's custody, that resulted in the required amputation of the end of one of the child's fingers.

On January 14, 2016, the trial court entered an agreed order for a temporary parenting plan that provided for, among other things, alternating 48-hour periods of parenting time. The parties continued to swap custody of the child every two days for the next four years, during their protracted and extensive litigation. On March 14, 2016, the trial court entered a decree declaring the parties divorced, approving and adopting their marital dissolution agreement, and reserving all matters pertaining to the child.

The trial court entered an order on March 23, 2016, stating as follows in pertinent part:

> Both parties'[] motions for Rule 35 examinations are granted as to a parenting assessment only, and not for mental examinations. Upon agreement, the parties designate Dr. William Hillner to perform the parenting assessments. Upon further agreement, [the] doctor is informed that he is not requested to do any comparative examination but only to examine both parties in their individual parenting capacities.

Father's complaint and request for a restraining order in juvenile court was voluntarily nonsuited by Father in early 2016. He subsequently filed at least three additional similar petitions in juvenile court: a petition for emergency custody or a temporary restraining order on July 13, 2016 (later dismissed for failure to appear in court); a petition for custody due to alleged dependency and neglect filed on August 22, 2017 (transferred by agreement to Chancery Court, which dismissed the petition for lack of evidence of dependency and neglect); and a petition for custody and a declaration of dependency and neglect on March 11, 2019 (dismissed on grounds of res judicata and improper venue). The trial court later found that "[i]n none of these proceedings has the Father produced sufficient evidence to substantiate his allegations" and "there has been little, if any, proof to substantiate those charges."

The trial court appointed Catherine White as the child's GAL on September 20, 2016. Father filed a motion to remove GAL White on October 16, 2017, alleging that the

GAL was biased in favor of Mother. Father argued that the GAL was minimizing the significance of some of the child's alleged injuries that happened on Mother's watch. He also asserted that the GAL "has not communicated with him in the same manner and frequency as the Mother." After a hearing on September 20, 2018, the trial court stated, "based on what I've heard during this hearing, I'm going to deny the motion to disqualify Ms. White as guardian ad litem, and I don't think there's been a showing of bias and certainly nothing that would cause me to disqualify her as an attorney for the child."

The trial on the reserved issues took place over an extended period of time and concluded in October of 2019. Dr. Hillner testified regarding his parenting assessment, recommendations, and conclusions. The trial court had earlier stated that it "would not review Dr. Hillner's report, nor hear his testimony, until after the parents have testified." However, scheduling and availability issues apparently arose during trial, and the trial court permitted Dr. Hillner to testify before it heard Mother's testimony, over Father's objection. Father later moved the trial court to exclude Dr. Hillner's testimony based on his allegation that he "had been hired by Mother to testify on her behalf." Dr. Hillner explained that Mother had asked him to "comment on the admissibility of a child's testimony at certain ages." This was several years after Dr. Hillner had prepared and submitted his parental assessment report. The trial court limited Dr. Hillner's testimony to his assessment report.

The trial court designated Mother primary residential parent, with parenting time during the school year except for Father's time of every other weekend from Thursday at 5:00 pm until Sunday at 5:00 pm. During the summer months, the parties were ordered to split parenting time by alternating weeks. The trial court, applying the statutory factors of Tenn. Code Ann. § 36-6-106, found and held as follows in pertinent part:

> Both parents have a strong relationship with [the child]. The [p]arents have been operating on a "48 hours on–48 hours off" parenting schedule . . . Even with that short time between transfers, it appears that the Mother spends more time with [the child] because she is a stay at home mom. In addition, she is involved in [the child's] home schooling.

> It is clear that the Mother has been and will continue to be more willing than the Father to encourage and foster [the child's] relationship with the non-custodial parent. There have been several instances in which the Mother has notified and consulted with the Father about [the child's] education and extra-curricular activities. She has invited him to attend several activities. He has declined. The Father, on the other hand, has not communicated with the Mother about enrolling [the child] in school or signing him up for baseball. She is left to discover these things on her own.

3

During the course of this litigation the Father has accused the Mother of, at best, neglecting [the child]. At worst, he has accused her of abusing or allowing the abuse of the child. The Court has heard the evidence on the Father's allegations, including a separate trial on dependency and neglect allegations, which were transferred here from the Juvenile Court. In none of these proceedings has the Father produced sufficient evidence to substantiate his allegations. It is noted that there was one incident in which the child had bruises on his buttocks caused by the Mother's spanking. However, that was one incident and there is no evidence that the Mother is abusive or violent with the child.

[The child's] relationship and interaction with his step brothers was the subject of several motions and hearings, including the dependency and neglect trial. The Father and his previous counsel continuously alleged that the step brothers are a constant threat to [the child's] safety. The most serious allegation involved the amputation of [the child's] finger. The Father contended that it was done by one of the step brothers. There were allegations that the step brother intentionally cut off the finger. However, the proof produced at the dependency and neglect hearing was that [the child's] injury was caused by an accident involving a portable "pull up bar" in the house. The Father continues to suspect that the Mother allows the step children to bully and abuse [the child], when there has been little, if any, proof to substantiate those charges.

During the most recent hearing, the Father was asked why he did not warn the Mother that the step brothers were a "danger" to [the child]. His response was that he felt it would be better if [the child], who at that time was 4 or 5 years old, told his mother. That explanation makes no sense and caused concerns about the Father's credibility.

In March, 2019, while this litigation was pending, the Father filed another dependency and neglect petition in the Juvenile Court. The allegations were the same allegations that had been tried as a dependency and neglect case in this Court. The Juvenile Court Magistrate dismissed the 2019 petition on the grounds of res judicata, finding that this Court had already decided the issues.

These matters are cited to explain why this Court is convinced that the Father would not encourage or foster any relationship between the child and his Mother if he were declared the Primary Residential Parent. The evidence indicates that he would, in fact, do the exact opposite.

In regard to the persons residing in each parent's home, there does not seem to be a problem. Both of the parents' current spouses are good to [the child] and he has a good relationship with both.

(Numbering in original omitted).

The GAL filed a motion requesting $29,493.50 for fees and costs. The trial court reviewed her affidavit and timesheets recording her time expended and charged, applying the factors provided by Tenn. Sup. Ct. Rule 40A, section 11. The trial court approved $21,000 of the GAL's fees and costs. The court further found that "the Father has the greater capacity to pay" and "a substantial portion of the time expended by the GAL was caused by the positions taken by the Father," and ordered Father to pay two-thirds of the remaining balance owed the GAL.

Mother filed a motion requesting an award of $182,143.22 in her attorney's fees. The trial court found that Mother was the prevailing party and stated that "[t]o say this was a contentious custody battle would be a gross understatement." The trial court held as follows:

In regard to the factors in Rule 1.5 of the [Rules of Professional Conduct], the Court [finds that] the issues in this case were not novel or complex. However, the time spent on this case by lawyers for both sides was not reasonable. . . . [I]t is only fair to state that the Court's criticism of the lawyers' actions in this matter apply to the Mother's attorney and the Father's original attorney. The Father's current attorney was not involved in the practices describe[d] later in this Order.[3] . . . [M]uch of the fault for the excessive time it took to resolve this case and the excessive attorney fees can be put on the lawyers.

The trial court, reducing the requested amount of fees for time expended found to be "excessive" and "totally unnecessary," awarded Mother attorney's fees in the total amount of $89,801.50.

## II. ISSUES PRESENTED

Father presents the following issues, as quoted from his brief:

---

[3] Father's "current attorney[s]" referred to by the trial court are also his lawyers on appeal. The criticism of Father's "original attorney" thus does not apply to his current appellate attorneys.

5

1.    Did the Trial Court err by adopting the December 18, 2019 Permanent Parenting Plan and finding [the] plan to be in the best interest of the parties' child?

2.    Did the Trial Court err in permitting Dr. William Hillner to testify in the manner and scope in which he did?

3.    Did the Trial Court err in not relieving the Guardian ad Litem for bias in favor of Mother?

4.    Did the Trial Court err in finding that the Guardian ad Litem's fees were reasonable and necessary and, subsequently assessing the majority of those fees against Father?

5.    Did the Trial Court err in awarding Mother attorney's fees and discretionary costs?

Mother presents the additional issue of whether the trial court erred by not granting her request to sanction Father's former attorney for an alleged violation of the rules regarding discovery.

### III. STANDARD OF REVIEW

As stated by our Supreme Court,

In a non-jury case such as this one, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review the trial court's resolution of questions of law de novo, with no presumption of correctness.

*Kelly v. Kelly*, 445 S.W.3d 685, 691-92 (Tenn. 2014).

### IV. ANALYSIS

### A. Permanent Parenting Plan

Father argues that the trial court erred in finding that the permanent parenting plan it adopted was in the child's best interest. A trial court's decision regarding a parenting schedule is subject to review under the deferential abuse of discretion standard. *C.W.H. v.*

*L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017) (citing *Armbrister*, 414 S.W.3d at 693 ("A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion.")).  As the Supreme Court instructed in *C.W.H.*,

> This Court has previously emphasized the *limited* scope of review to be employed by an appellate court in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments.  *Armbrister*, 414 S.W.3d at 692-93. . . . Indeed, trial courts are in a better position to observe the witnesses and assess their credibility; therefore, trial courts enjoy broad discretion in formulating parenting plans. *Id*. at 693 (citing *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007)).  "Thus, determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.' " *Id*. (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)).  Appellate courts should not overturn a trial court's decision merely because reasonable minds could reach a different conclusion.  *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

*Id*. (emphasis in original).

A trial court making a custody determination must apply the following analysis proscribed by Tenn. Code Ann. § 36-6-106:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child.  In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors.  The court shall consider all relevant factors, including the following, where applicable:
>
> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
>
> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.  In determining the willingness

of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . .

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request.

The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

The trial court specifically considered and incorporated the pertinent statutory factors in its analysis and decision regarding the parenting plan.

Father argues that "the trial court incorrectly found that Mother had a closer relationship with the parties' child than the Father." The trial court did not make such a finding; its order states that "[b]oth parents have a strong relationship with" the child. Father takes issue with the court's finding that Mother has spent more time with the child. This finding was based in part on the facts that Father has a full-time job outside the house; Mother's full-time job was being a stay-at-home mom; and Mother had been homeschooling the child. The evidence additionally established that Mother spent much more time with the child during his earliest years.

On appeal, Father argues that "the most obvious difference" between the parents "is the parties' genders. It appears the Trial Court inappropriately presumed the Mother was closer to the child, whether consciously or subconsciously, due to societal stereotypes of women as caretakers." Father cites a "study" from a website that purports to show "a troubling trend of perhaps hidden influence" of "prejudice against men . . . that should be properly checked." As already noted, Father's premise that the trial court "presumed" the Mother was closer to the child is incorrect; the court did not find that the child was closer to the Mother, only that she spent more time with him by comparison, which was cited as one factor among many. The trial court made no statement that remotely supports an inference that it harbored a subconscious bias toward women as caretakers. The information presented in the website cited in Father's brief is not in the appellate record and was not presented or argued before the trial court. This argument is without merit.

Father takes issue with the trial court's finding that "the Mother has been and will continue to be more willing than the Father to encourage and foster [the child's] relationship with the non-custodial parent." The evidence does not preponderate against this conclusion. As an example, the trial court observed that Father, by his own admission, enrolled the child in school and a sports team without first communicating to Mother about these matters. Father's argument in this regard consists of reiterating many of the factual allegations against Mother and the proof he argues is in his favor, and asking this Court to evaluate the evidence anew, in a manner contrary to the trial court's evaluation. The trial

9

court specifically stated its "concerns about the Father's credibility." Because we did not see or hear the witnesses testify, we defer to the trial court's credibility findings. *E.g, Coleman v. Olson*, 551 S.W.3d 686, 694 (Tenn. 2018).

Father next argues that his "concerns of abuse and neglect informed [his] actions, and the Trial Court incorrectly held this against" him. In this case, it appears that numerous agencies and experts, including the juvenile and circuit courts, Department of Children's Services, Child Protective Services, and several medical professionals, have examined and evaluated Father's multiple claims of abuse or neglect, and found them unfounded. The trial court heard a great deal of testimony about the accident that resulted in the loss of the end of the child's ring finger on his left hand. It happened at the house of Nehemiah Ward, Mother's current husband. Mother, Mr. Ward, and Jason Potts, a family friend who was there at the house, all testified regarding the incident. The child, who was then a little older than two years, was in a doorway between the kitchen and a hallway. The adults were in a nearby room finishing dinner and getting ready to watch TV, only ten or twelve feet away but out of view of the doorway. There is no evidence in the record that anyone saw what happened.

They heard the child make a "whimpering or crying" sound, and shortly after that, his stepbrother, one of Mr. Ward's children, told them that something had happened to the child's finger. The child had suffered a compound fracture of his finger. They immediately took him to the emergency room. Mother called Father to tell him about the accident on the way. The finger eventually had to be surgically amputated above the first joint.

In the doorway there was an exercise bar for doing pull-ups or push-ups. It was on the floor with the child at the time he was injured. Mr. Potts testified that "other than a fallen pull-up bar that had worn off end pieces, there was nothing to explain how a small child loses his finger." Mr. Ward testified that after the hospital trip, they examined the scene to try to figure out what had happened. They couldn't find anything "that looked like it was menacing." Mr. Ward said "at that point we just guessed that it had been either the door hinge or the pull-up bar that he was laying on." Everyone who testified regarding the accident stated that there was no other sharp object like a knife in the vicinity of the accident.

Father argues that Mother's failure to "provide an explanation for the injury outside of saying a pullup/pushup bar likely caused [it]" demonstrates evidence of abuse or neglect. The trial court, having seen and heard the witnesses, was not convinced. The truth appears to be that no one knows exactly how or why the accident happened, and there is not enough evidence to solve the mystery. We find no error in the trial court's factual evaluation of the allegations of abuse and neglect by Father.

Father's final argument regarding the parenting plan is his assertion that the trial court "inconsistently incorporated recommendations from experts," particularly with regard to the child's education. The trial court noted that several experts recommended traditional public schooling, but it ultimately found that "the home school choice made by the Mother is a reasonable choice and there is no evidence that [the child] is harmed by that choice." The trial court heard extensive evidence about Mother's choice to homeschool, including the homeschooling co-op network she is involved in and her curriculum choices. The court also ordered "that the Mother will, at her expense, have [the child] tested before the end of the school year to ensure that he is at grade level in all the required academic disciplines." The testimony or recommendation of an expert is generally advisory and not binding upon the trial court as trier of fact. *Brunetz v. Brunetz*, 573 S.W.3d 173, 182 (Tenn. Ct. App. 2018) ("The trial judge, as the trier of fact, is not compelled to unequivocally accept expert opinions"; holding opinion of parental evaluator "is not binding upon the trial court.") (quoting *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 233 (Tenn. Ct. App. 2009)). The decision regarding the child's education is one about which reasonable minds could reach differing conclusions. We do not find reversible error in the trial court's decision to allow Mother to continue homeschooling the child.

## B. Dr. Hillner's Testimony

Father argues that the trial court erred in denying his request to exclude the testimony of Dr. Hillner, the expert parental evaluator, upon Father's alleged ground that Dr. Hillner was biased or had the appearance of bias in favor of Mother. "We review issues related to the admission or exclusion of evidence at trial, including the admission or exclusion of expert testimony, for an abuse of discretion." *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davidson*, 509 S.W.3d 156, 208 (Tenn. 2016) ("Determinations regarding the qualifications, admissibility, relevance, and competence of expert testimony fall within the broad discretion of the trial court and will be overturned only for an arbitrary exercise or abuse of that discretion.").

Dr. Hillner testified that his assessment began on April 14, 2016, and concluded on September 23, 2016. Apparently, Mother or her counsel later asked Dr. Hillner to comment or testify about at least one other matter pertinent to the trial. The exact scope and nature of this request is not spelled out in the record. At trial, the following exchange took place:

Q: [Father's counsel] [Y]ou agreed to be hired by the Mother's attorney this year to testify against the Father as an expert in this case, correct?
A: [Dr. Hillner] No.
Q: You were hired by [Mother's counsel] to give testimony outside the scope of this report?

A: But not against the Father.

Q: Against the Father's expert, Haydee Perez-Parra?

A: I was asked to comment on the admissibility of a child's testimony at certain ages.

Q: Okay. . . And the judge has ordered that you're not allowed to testify about the matters for which the Mother hired you for; is that correct?

A: As far as I know, yes.

Q: Okay. And the evaluation guidelines state that you should request access to all family members involved, correct?

THE COURT: Ms. Moore, am I ruling on that?

[Father's counsel]: You already had.

THE COURT: As I said−and in my ruling on that, I made it clear and was making no finding whatsoever that Dr. Hillner had violated any ethical standards. It was a matter of fairness in this case, under the circumstances of this case, and in the pleadings of this case that I found he could not offer the testimony.

[Father's counsel]: Yes, Your Honor.

THE COURT: Now, what's that got to do with what we're here about today, which is the parenting evaluation?

[Father's counsel]: The bias of a witness I think− I thought was always relevant to the proceedings.

THE COURT: Well, I mean, if, in fact, there's some bias there, it came well after this parenting evaluation was done. This parenting evaluation was done two years ago. And the agreement, if I have my facts correct, the agreement in regards to the other testimony was just within the past several months, so the parenting evaluation was done. The report was in the court file long before the subject of him doing anything beyond that even came up . . . So I don't see how that would affect his testimony on the parenting issues.

As can be seen from the above, the trial court limited Dr. Hillner's testimony to his parenting assessment, did not allow him to testify about other matters, and cogently explained the reasons why it made these rulings. The trial court did not abuse its discretion in declining Father's request to exclude Dr. Hillner's testimony entirely.

As already noted, the trial court's agreed order appointing Dr. Hillner stated that he was "not requested to do any comparative examination." The court entered a later order stating that "the parties and experts are reminded that the terms of this Court's [o]rder [appointing Dr. Hillner] are and remain in full force and effect," and "in the event it becomes necessary, counsel shall timely meet after the conference with Dr. Hillner . . . and redact any matters from any written reports or documentation which conflict with the Court's prior [o]rder." At trial, Dr. Hillner testified:

Q: [T]he court order ordered you to perform a parenting evaluation and not to make any comparisons; is that correct?
A: I—I can't do a parenting evaluation without making comparisons.
Q: Yes. And you advised both counsel in an e-mail that you would be making comparisons, correct?
A: That's correct.

On appeal, Father argues that "to permit Dr. Hillner to testify after flaunting his contempt for the Trial Court's orders was error." The gist of this argument appears to be that the trial court should have sanctioned or punished Dr. Hillner for his view that some degree of comparison was an integral aspect of conducting a parental assessment of both parties. Father did not request the trial court to take this action, nor did he raise this as an issue below. The trial court did not abuse its discretion in allowing and considering Dr. Hillner's testimony.

Finally, as regards Dr. Hillner's testimony, Father argues that the trial court erred in allowing Dr. Hillner to testify before Mother, despite earlier stating that it intended to hear the parties first. The trial court apparently allowed the change of order of witnesses as a matter of expedience and courtesy to some of the witnesses, to accommodate scheduling issues. "The trial judge is the individual who is ultimately responsible for every aspect of the orchestration of the trial." *State v. Wiseman*, 643 S.W.2d 354, 366 (Tenn. Crim. App. 1982). Thus, "[t]he trial judge has discretion to allow [witnesses to testify in a different order], for he [or she] is vested with authority to determine the order in which witnesses may be examined and the time at which the examination will occur." *Id.* This issue is without merit.

## C. Refusal to Disqualify Guardian ad Litem

Father asserts that the trial court erred in denying his motion to remove Catherine White as GAL. He argues that the GAL was biased in favor of Mother. As a primary ground for this argument, Father points to "the Guardian's numerous communications with Mother and scant communications with Father." The decision as to whether to remove or disqualify a GAL falls within the discretion of the trial court, and is subject to an abuse of discretion standard of review. *Campbell v. Campbell*, No. W2004-01608-COA-R3-CV, 2005 WL 1768724, at *2 (Tenn. Ct. App. July 25, 2005); *In re Adoption of DPM*, No. E2002-02809-COA-R3-CV, 2003 WL 22415357, *2 (Tenn. Ct. App. Oct. 23, 2003).

Father complains that the GAL texted and emailed with Mother substantially more than with him. He argued to the trial court that considering the comparative volume of communications, "I might suggest to you that it is not necessarily bias, but it is disparate

13

in its performance." On appeal he argues that this "disparity of performance rises to the level of an appearance of impropriety." At the hearing of Father's motion to disqualify, the GAL stated that "I have carried out my duties in an unbiased, objective, and fair manner as the proof will show." She questioned Father at the hearing. The proof, including his testimony, established that (1) the abundance of communication with Mother was primarily a result of Mother initiating text or email messages; (2) the GAL's office always promptly responded to those relatively few communications initiated by Father that required a response; (3) the GAL responded to roughly the same percentage of communications initiated by both parties; and (4) the GAL never discouraged Father from communicating with her. We have reviewed the record in light of Father's complaints of apparent bias of the GAL. We agree with and affirm the trial court's finding that Father made no "showing of bias and certainly nothing that would cause [her disqualification] as attorney for the child."

## D. Award of GAL's Fees

In a divorce action involving a minor child, when the trial court has appointed a GAL, "[t]he reasonable fees or costs of the guardian ad litem shall be borne by the parties and may be assessed by the court as it deems equitable." Tenn. Code Ann. § 36-4-132(b). Father disputes the trial court's determination that $21,000 of the GAL's requested $29,493.50 in fees was reasonable. "In awarding guardian ad litem fees in a custody case, the trial court is given wide discretion, and this court will not interfere in the exercise of that discretion absent a clear showing of abuse." *Keisling v. Keisling*, 196 S.W.3d 703, 726 (Tenn. Ct. App. 2005).

Tennessee Sup. Ct. Rule 40A, section 11 provides that

(a) The guardian ad litem shall be compensated for fees and expenses in an amount the court determines is reasonable. In determining whether the guardian ad litem's fees and expenses are reasonable, the court shall consider the following factors:
(1) the time expended by the guardian;
(2) the contentiousness of the litigation;
(3) the complexity of the issues before the court;
(4) the expenses reasonably incurred by the guardian;
(5) the financial ability of each party to pay fees and costs;
(6) the fee customarily charged in the locality for similar services; and
(7) any other factors the court considers necessary.

The trial court, assessing the GAL's fee application in light of these factors, ruled as follows:

14

1. The GAL expended a lot of time. The issue is how much of that time was necessary to perform her duties. The time spent preparing the report will be excluded. That equals three (3) hours of attorney time at $225.00 per hour and one (l) hour of paralegal time at $85.00 per hour, for a total of $760.00. The rest of the attorney time charged by the GAL is extensive, but much of that time is the result of the endless motions and arguments filed by the parties.

2. The Court finds that, as noted in the previous section, this litigation was particularly contentious. Over the course of several months, it was unusual for the parties <u>not</u> to be at the Monday morning motion call to argue one or several motions which could have and should have been avoided by any semblance of cooperation. The GAL did not appear at all motions, but was required to be at and participate in several hearings. As noted, the Father filed a petition alleging that [the child] was dependent and neglected. The GAL was required to attend and participate in those hearings and the trial.

3. The Father has a greater capacity to pay fees than the Mother.

4. The hourly fee charged by the Guardian ad Litem is reasonable for this legal community.

The GAL charged $225.00 per hour for 122.7 hours, which equals $27,607.50. In addition, the Court deducted $760.00 in relation to the report. That leaves a total of $26,847.50. The Court awards $20,000.00 as fees.

The GAL's paralegal charged a lot of time. However, much of the work reflected in the affidavit is administrative tasks. The Court awards $1,000.00 of the paralegal's time. The total fees awarded are $21,000.00. Deducting the $3,494.25 that the parties already paid, leaves a balance of $17,505.75.

As noted, the Father has the greater capacity to pay. In addition, a substantial portion of the time expended by the GAL was caused by the positions taken by the Father. Therefore, the Court [o]rders that the Father will pay 66 2/3% of the balance owed and the Mother 33 1/3%.

(Emphasis in original).

It is apparent from the above-quoted order that the trial court properly considered and applied the pertinent guiding principles in awarding the GAL's fees. Father briefly argues, without citation to supporting authority, that the GAL should not be paid for

working on "procedural matters." He also states that he "disputes the finding that Father alone caused the protracted nature of the proceedings in the trial court." On this point Father has again mischaracterized the trial court's ruling. The court stated that "a substantial portion of the time expended by the GAL was caused by the positions taken by the Father." The proof and pleadings in the record support this observation. We do not find the trial court abused its "wide discretion" in its award of GAL fees.

### E. Award of Attorney's Fees and Costs to Mother

An award of attorney's fees in an action involving child custody is authorized by Tenn. Code Ann. § 36-5-103(c), which provides in pertinent part as follows:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party . . . in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

"The applicable standard of review is that of abuse of discretion." *Choate v. Choate*, No. E2020-01503-COA-R3-CV, 2021 WL 4944863, at *23 (Tenn. Ct. App. Oct. 25, 2021) (citing *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017)).

Father's primary argument in support of his position that the trial court erred in its award of $89,801.50 in fees and costs is that Mother should not be considered the prevailing party in light of his arguments on appeal. However, we have rejected those arguments, and Mother has prevailed on each of Father's raised issues on appeal.

When a trial court is tasked with determining reasonable and necessary attorney's fees, Tenn. Sup. Ct. Rule 8, RPC 1.5 provides the following relevant factors to consider:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
> (8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
(10) whether the fee agreement is in writing.

The trial court cited and applied the pertinent Rule 1.5 factors in this case, stating:

The issues in this case were not novel or complex. However, the time spent on this case by lawyers for both sides was not reasonable.

\*    \*    \*

[T]he Court reviewed, among other pleadings, the Mother's attorney's billing records and the Rule Docket Report from the Clerk & Master. . . .[F]rom the filing of the [c]omplaint in May, 2015 through December 20, 2018, the lawyers filed approximately 98 motions. It is also noted that for many, if not most of those motions, one or both parties would file orders under the Five Day Rule, which means they disagreed on what the Court ruled. The clear indication is that the lawyers failed or refused to talk to each other before filing motions and could not or would not agree on what the Court ruled. It is apparent to the Court that there was little, if any, effort to consult each other and try to resolve issues short of filing motions or separate orders after those motions were heard.

There was the matter of the Father's Dependency and Neglect Petition filed against the Mother in Juvenile Court. The Juvenile Court transferred that case to be tried in this Court, in that the evidence produced in that trial would be relevant to the custody issues before this Court. The petition was advanced by the Father and, as set forth in the Court's order of October 4, 2018, the Father failed to present clear and convincing proof to support that petition. The Court awards the time actually spent by Mother's counsel in court defending those allegations. That time equals fees of $7,975.00. However, the Mother's counsel also lists trial preparation time of 96.2 hours. That is excessive. While the trial lasted over three days, it was a bench trial and issues presented during the trial had been litigated in several motions before the trial took place. In other words, there were few new issues presented during the trial. Trial preparation of 98 hours was excessive. The Court reduces trial preparation time to 30 hours, which equals $8,250.00. Therefore, the total for trial preparation and trial of the dependency and neglect issue is $ 16,220.00.

17

The remaining fees requested were spent on the 98 motions filed and the numerous Five Day Rule orders filed, which were, to the large extent, totally unnecessary. After subtracting the fees for the preparation for and trial of the dependency and neglect petition, the remaining fees requested are $147,163.00. The Court awards [f]ifty [p]ercent (50%) of those fees, which is $73,163.00.

It is apparent that the trial court properly considered and applied the pertinent factors in awarding attorney's fees to Mother. As we recently stated in *Choate*, "[t]he Trial Court's decision as to attorney's fees was logical; in accordance with the governing law; supported by the evidence; and one upon which reasonable minds could differ, while being within the range of reasonable discretionary outcomes." 2021 WL 4944863, at *23. We find no abuse of discretion in the award of attorney's fees and costs.

### F. Mother's Request for Sanctions Against Former Attorney

The final issue is Mother's request for sanctions against Father's former attorney for an alleged discovery violation. Approximately 32 days before trial, Mary Sullivan Moore, Father's attorney for the first roughly three and a half years of litigation, filed an amended answer to expert witness interrogatories propounded to Father. In the answer, Father stated "my counsel may call Haydee Perez-Parra," a counselor who had seen the child in therapy. He also said that "it is believed that this witness will testify about child abuse and/or neglect" of the child. Mother moved to strike the amended answer as untimely. The trial court denied the motion, qualified Ms. Perez-Parra as an expert, allowed Mother to take her discovery deposition, and postponed the trial.

Mother also moved for sanctions against attorney Moore, arguing that she violated the provisions of Tenn. R. Civ. P. 26.07 requiring an attorney to certify that a discovery response is "not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Mother deposed Ms. Perez-Parra, who also testified at trial. Regarding her testimony, the trial court found as follows:

[Haydee] Perez-Parra counseled [the child] for an extended time. She testified on at least two occasions and deposition testimony is part of the record. The counseling provided was, hopefully, beneficial to [the child]. However, Ms. Perez-Parra's testimony was not helpful to the Court in deciding parenting issues. It appeared to the Court that Ms. Perez-Parra's testimony was used more as a weapon than as an aid to the Court in determining what is in the child's best interest.

18

The trial court did not impose sanctions on Father's attorney. As the trial court found, Ms. Perez-Parra counseled the child "for an extended time," and thus there was a good faith basis to believe her testimony would be pertinent to the issues at trial. We find nothing in the record that provides a ground to impose sanctions on attorney Moore. There is no apparent discovery violation of Rule 26.07, nor is there reason to infer that the response was filed to cause unnecessary delay.

## V. CONCLUSION

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant, Kenneth F. Morgan, Jr., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE

19